1

2

3

4

5

6

7

8

9

10              **IN THE UNITED STATES DISTRICT COURT**

11                  **FOR THE DISTRICT OF ARIZONA**

12

13  **UNITED STATES OF AMERICA,**        )
                                          )
14              **Plaintiff,**            )     **No. CR 09-2795-TUC-JMR (CRP)**
                                          )
15  **vs.**                               )     **REPORT AND RECOMMENDATION**
                                          )
16                                        )
    **ERNESTO**                           )
17  **HERNANDEZ-BARRAGAN,**               )
                                          )
18              **Defendant.**            )
                                          )
19  ─────────────────────────────────

20          Defendant brings a Motion to Suppress Statements and Evidence based on an

21  alleged unlawful arrest or in the alternative, a violation of *Miranda*. (Doc. 20). The

22  Government contests the Motion. (Doc. 25). Defendant filed a reply. (Doc. 27).

23  Magistrate Judge Pyle conducted an evidentiary hearing on Wednesday, October 13, 2010

24  and continuing on Thursday, November 4, 2010. (Docs. 28, 37). For the reasons

25  discussed within, the Magistrate Judge recommends that the District Judge, after his

26  independent review, GRANT Defendant's Motion as to the signed negative declaration

27  form and any statements made during an interrogation with Sergeant Wilkinson and

28  DENY Defendant's Motion in all other requests for suppression.

1    **I.    FACTUAL FINDINGS**

2         At the evidentiary hearing, the Government presented the testimony of United

3    States Customs Border Protection Officer Eduardo Cazarez, Douglas Police Department

4    Detective Sergeant Mark Wilkinson, and Homeland Security Investigations Special Agent

5    Derrick Merchant.  Defendant Ernesto Hernandez-Barragan also testified.

6         On December 2, 2009 around 4:30 p.m., Defendant's vehicle was stopped for

7    inspection while crossing through the Douglas port of entry into Mexico.  (Doc. 33,

8    Transcript from Day 1 of the Evidentiary Hearing 10/13/10 ("TR 1") at 17, 70).  Officer

9    Cazarez, who was working the primary inspection lane, was the first officer to encounter

10   Defendant.  (TR 1 at 18, 71).  Sergeant Wilkinson was also in the primary inspection area,

11   running status checks on vehicles' license plates.  (TR 1 at 72).   When asked why a state

12   officer was working at a port of entry, Sergeant Wilkinson explained that state officers

13   are paid to assist at the port of entry with outbound inspections through a federally funded

14   program called Operation Stonegarden.  (TR 1 at 71).

15        In the primary inspection area, Officer Cazarez approached Defendant's vehicle

16   and asked Defendant where he was going.  (TR 1 at 18).  Defendant told him he and his

17   passenger, his girlfriend, were going to Janos, Chihuahua, Mexico for a few days.  (TR 1

18   at 19, 37).  Defendant also told the officer that they were traveling from Glendale,

19   Arizona where they lived.  (TR 1 at 19).  Officer Cazarez asked Defendant if he was

20   carrying more than $10,000 or any weapons.  (TR 1 at 19).  Defendant said no.  (TR 1 at

21   19).  Defendant told Officer Cazarez that he was carrying just over $2000.  (TR 1 at 19).

22   Officer Cazarez then asked who owned the truck.  (TR 1 at 19).  Defendant told him it

23   was a friend's truck.  (TR 1 at 19).  As Officer Cazarez testified, at that point, he

24   determined the vehicle should go to secondary for additional inspection.  (TR 1 at 19).

25   Then Sergeant Wilkinson informed Officer Cazarez that the vehicle was missing a license

26   plate so Officer Cazarez testified that in secondary he wanted to ensure the vehicle was

27   not stolen or being illegally exported.  (TR 1 at 19, 58, 72).

28                                          - 2 -

1    In secondary, Officer Cazarez continued asking Defendant questions. (TR 1 at

2  35). He again asked Defendant whether he had over $10,000 and Defendant said no. (TR

3  1 at 20). Around this time, Officer Cazarez asked Defendant and his girlfriend to exit the

4  vehicle. (TR 1 at 35). Officer Cazarez asked for identification; Defendant and his

5  girlfriend both provided valid identification. (TR 1 at 20, 72). At some point in

6  secondary, Defendant told Officer Cazarez that he and his girlfriend were going to

7  Chihuahua for four days. (TR 1 at 51).

8    Sergeant Wilkinson also asked questions of Defendant and his girlfriend while

9  they were in secondary. Sergeant Wilkinson asked Defendant what he was doing and

10  Defendant told him that he and his girlfriend were traveling to Chihuahua to pick up their

11  three year-old daughter who had been there for four weeks and that they were planning to

12  stay for four days. (TR 1 at 60). Defendant's girlfriend gave Sergeant Wilkinson the

13  same travel plan. (TR 1 at 74). Sergeant Wilkinson also asked about the missing license

14  plate on Defendant's vehicle and Defendant produced the valid license plate from the

15  back seat and explained that license plates were stolen at his apartment complex so he did

16  not keep this one on the outside of the truck. (TR 1 at 72-73). Defendant also explained

17  to Sergeant Wilkinson that the truck belonged to a friend. (TR 1 at 73).

18    Officer Cazarez searched through the luggage in the vehicle as part of his duties in

19  secondary. (TR 1 at 21). Officer Cazarez noticed the luggage contained no female

20  clothing. He found this suspicious as Defendant told him in primary that he and his

21  girlfriend were traveling to Chihuahua for a couple of days. (TR 1 at 21). Officer

22  Cazarez also noticed a new pair of pants that was size 32 or 33. (TR 1 at 21, 36). When

23  he asked Defendant what size waist he was, Defendant said he was a 38. (TR 1 at 22).

24  This further raised Officer Cazarez's suspicions as the luggage did not appear to belong to

25  Defendant or his girlfriend. (TR 1 at 22). In Officer Cazarez's experience, smugglers

26  will "stage" a vehicle "meaning in the smuggling attempt they'll actually use props to

27  deter our inspection to make everything seem, you know, it was normal." (TR 1 at 22).

28
- 3 -

1   While the wrong-sized pants and lack of female clothing was suspicious, Officer Cazarez

2   admitted he did not inventory all the items in the suitcase and he agreed the suitcase

3   contained other used clothing items.  (TR 1 at 36).

4        Sergeant Wilkinson, who learned from Officer Cazarez that the luggage had no

5   female clothing, asked Defendant's girlfriend about her lack of clothing for the trip.  (TR

6   1 at 60-61).  Defendant's girlfriend told Sergeant Wilkinson that she and Defendant were

7   traveling to her sister's house and that she planned to borrow clothes from her sister

8   because they wore the same size.  (TR 1 at 61).  Sergeant Wilkinson found this unusual,

9   especially because people usually travel with their own undergarments.  (TR 1 at 61).

10  Sergeant Wilkinson also asked Defendant why his girlfriend did not have any clothes in

11  the luggage.  (TR 1 at 61).  He told Sergeant Wilkinson that she may have forgotten her

12  luggage.  (TR 1 at 61).

13       On a physical inspection of the vehicle, Officer Cazarez noticed the carpet on the

14  driver side floor was extremely loose.  (TR 1 at 22, 37-38).  Officer Cazarez pulled up the

15  carpet and discovered a hidden compartment in the floor of the truck cabin.  (TR 1 at 22).

16  Officer Cazarez testified that the compartment was open.  (TR 1 at 22).  Officer Cazarez

17  inspected the compartment through the opening but did not see anything in the

18  compartment at that time.  (TR 1 at 23).  In Officer Cazarez's experience, a hidden

19  compartment is used to conceal contraband that is being smuggled in or out of the

20  country.  (TR 1 at 23).

21       After Officer Cazarez discovered the hidden compartment, he told Sergeant

22  Wilkinson and another officer that Defendant and his girlfriend needed to be "taken in."

23  (TR 1 at 23, 62).  There was some dispute at the evidentiary hearing as to whether Officer

24  Cazarez told the other law enforcement officers to "detain" Defendant and his girlfriend

25  or "take them into custody."  (TR 1 at 39).  As Officer Cazarez admitted on cross-

26  examination, in his report after the incident, he wrote "I requested the Douglas police

27  officer to take the female into custody and the border patrol agent to take the male into

28                                      - 4 -

custody." (TR 1 at 39). Defendant testified that when he was standing in secondary one of the officers looking in the vehicle said "I found it or I found something" and that the officer who was behind Defendant told him he was under arrest and handcuffed him. (Doc. 39, Transcript for Day 2 of the Evidentiary Hearing 11/4/10 ("TR 2") at 37). No one told Defendant that he would be free to leave if nothing was found in the truck. (TR 2 at 37). Likewise, no one told Defendant that he was only being detained or that he was being detained for safety reasons. (TR 2 at 38).

Officer Cazarez testified that he had officer safety concerns with Defendant and his girlfriend given his lack of knowledge about them and he was also concerned Defendant and his girlfriend might try to flee across the border, which was only 50 yards away. (TR 1 at 23-24). Both Officer Cazarez and Sergeant Wilkinson testified that they intended to detain Defendant but not arrest him at that point. (TR 1 at 51, 74).

Defendant and his girlfriend were taken to separate "detention cells" that contained an aluminum bed, a urinal and a sink. (TR 1 at 24). In the detention cell, Defendant's shoes and belt were removed. (TR 1 at 42). Defendant testified that the officers took his cell phone, wallet, shoes, belt and money. (TR 2 at 38). After the officers searched him, Defendant testified that they left and shut the door to the detention cell. (TR 2 at 38). There was no handle on the door of the detention cell and it was a locked cell when the door was closed. (TR 2 at 38, TR 1 at 52).

After Defendant was placed in the detention cell, Officer Cazarez went in the cell to give Defendant a declaration form that asked Defendant to state whether he was transporting any money or weapons. Defendant and Officer Cazarez disagree as to whether Officer Cazarez came into a locked cell or whether the cell was open when he entered. The factual disagreement is not critical to a determination of custody. (*See* TR 2 at 40, TR 1, 42). Even if the cell was open, as Officer Cazarez testified, at least three other officers were still present in the cell, removing Defendant's personal belongings and completing the pat-down. (TR 1 at 42, 52-53). Officer Cazarez agreed that after the

- 5 -

1   officers completed the pat down of Defendant, Defendant would be left in the cell alone

2   with the door closed and locked.  (TR 1 at 52).

3        The declaration form Officer Cazarez asked Defendant to sign asks the person

4   signing it to admit or deny that he was transporting more than $10,000 and admit or deny

5   whether he was transporting any weapons.  (TR 1 at 44, *see also* Exhibit 107).  Officer

6   Cazarez did not read Defendant his *Miranda* rights before giving him the declaration

7   form to sign.  (TR 1 at 43, TR 2 at 40).  Officer Cazarez asked Defendant to declare how

8   much money he had with him.  (TR 1 at 44).  Defendant made a negative declaration;

9   stating he was not carrying more than $10,000 with him and again told Officer Cazarez

10  that he had around $2000.  (TR 1 at 25).

11       After Defendant signed the form and Officer Cazarez took back his pen and was

12  about to exit the detention cell, Defendant stated, "I have a question."  (TR 1 at 25-26).

13  Officer Cazarez asked him what was the question and Defendant replied, "[s]ince you

14  already found the money, why did you have me sign the form?"  (TR 1 at 26).  At that

15  point Officer Cazarez said he did not reply and left the cell.  (TR 1 at 26).

16       The Court notes that Defendant testified he made this statement to Officer Cazarez

17  before he signed the form.  (TR 2 at 41).  He said that after he made the statement, Officer

18  Cazarez smiled and told him to just sign the form, which he did.  (TR 2 at 41).  The Court

19  finds Officer Cazarez's version of this conversation more credible.

20       While Officer Cazarez asked Defendant to sign the declaration form, no one was

21  searching Defendant's vehicle.  (TR 1 at 40, 46).  After Defendant made the statement to

22  Officer Cazarez about officers finding money in the truck, Officer Cazarez told his

23  supervisor and Sergeant Wilkinson about Defendant's statement.  (TR 1 at 46, 74).  He

24  then resumed, with the help of other officers, searching Defendant's vehicle.

25       At the evidentiary hearing, the defense argued law enforcement would not have

26  continued searching Defendant's vehicle but for the alleged illegal statements law

27  enforcement obtained from Defendant.  Based on the testimony, after Defendant made the

28                                    - 6 -

statement about officers finding money in the truck, this Court concludes law enforcement intended to continue searching Defendant's vehicle until contraband was found or the entire compartment was determined to be empty.  This conclusion is further supported by the case agent's testimony that Officer Cazarez told the case agent Defendant's statement led them to further search the truck.  (TR 2 at 18).

After Defendant's statement about the officers finding money in his truck, further searching revealed four more trap doors to the hidden compartment but no contraband. (TR 1 at 46-47, 76).  After multiple doors to the hidden compartment were discovered but the officers still had not found any contraband, Sergeant Wilkinson asked Agent Jesse Arellano if his agency planned to file federal charges and seize the truck.  (TR 1 at 62, 76, 78-79).  Agent Arellano told Sergeant Wilkinson that the federal agency would "probably" seize the vehicle.  (TR 1 at 81).  Sergeant Wilkinson told Agent Arellano that if his agency was not going to seize the vehicle, he would call his Douglas Police Department and the county attorney to see if they would seize the vehicle.  (TR 1 at 62-63, 76).  Sergeant Wilkinson then asked Agent Arellano if he could talk to Defendant and Defendant's girlfriend; Agent Arellano said yes.  (TR 1 at 63).

At the evidentiary hearing, Sergeant Wilkinson was asked about his intent in talking with Defendant and his girlfriend.  The defense maintained that Sergeant Wilkinson interrogated Defendant during his conversation with him and that all statements from this conversation should be suppressed.  The defense also argued Sergeant Wilkinson's questioning was part of a deliberate two-step interrogation intent on depriving Defendant of his *Miranda* rights.

When asked on cross-examination whether he wanted to get a statement from Defendant and his girlfriend, Sergeant Wilkinson said, "I wanted to prep them for when I questioned them as far as state of mind saying okay, I'm dealing with a state official instead of a federal official." (TR 1 at 83).  Sergeant Wilkinson was again asked if his intention was to get a statement from Defendant and his girlfriend.  He said "I wanted get

- 7 -

1   a reaction." (TR 1 at 83).  When asked "and by a reaction you mean a statement, a

2   confession?", Sergeant Wilkinson replied "[n]o, not necessarily.  What I wanted to do is

3   get a reaction, get a feel for them because if I'm going to be interviewing them later, I

4   want to go in there with the right frame of mind as to how I'm going to do that

5   interview." (TR 1 at 83).  Sergeant Wilkinson then agreed that when he went in to talk

6   with Defendant he intended to get a reaction and to get information about them for a later

7   interview.  (TR 1 at 83).

8          Sergeant Wilkinson started with Defendant's girlfriend.  He told her that "there

9   was a possibility this might go state if no federal prosecution was sought." (TR 1 at 63).

10  He then told her it was a crime to lie to a Arizona state police officer.  (TR 1 at 63).  He

11  testified that she then told him that she and Defendant were traveling to pick up her

12  nephew not her son.  (TR 1 at 63).

13         Sergeant Wilkinson then went to talk with Defendant.  Defendant was alone,

14  locked in the detention cell.  (TR 1 at 84).  Defendant testified that he had been in the cell

15  by himself for two or more hours.  (TR 2 at 41).  When he went into the cell, Sergeant

16  Wilkinson did not read Defendant his *Miranda* rights.  (TR 1 at 87).  Sergeant Wilkinson

17  believed the interrogation was maybe five minutes but as the testimony showed, Sergeant

18  Wilkinson covered a lot of information during the time he talked to Defendant.  (TR 1 at

19  84).

20         Sergeant Wilkinson began the conversation by asking Defendant what he did for a

21  living, which led to a longer conversation about welding.  (TR 1 at 84-85).  Sergeant

22  Wilkinson asked Defendant detailed questions about welding because he wanted to see if

23  Defendant was being truthful with him.  (TR 1 at 85-86).  Sergeant Wilkinson admitted

24  that he did not include any of the conversation he had with Defendant about welding in

25  his police report.  (TR 1 at 86).  He then told Defendant that there was a possibility that

26  the state might seek prosecution, that the compartments had already been discovered and

27  that there was no reason to lie.  (TR 1 at 64, 86).  Sergeant Wilkinson then asked him why

28

1  he had lied about going to pick up the child and Defendant told him because he was being

2  paid to deliver the truck to Jonas, Chihuahua.  (TR 1 at 87, TR 2 at 42).  Sergeant

3  Wilkinson then directly asked Defendant how much money was in the truck.  (TR 1 at

4  87).  Sergeant Wilkinson testified that Defendant said he believed "it was more than

5  $10,000."  (TR 1 at 64, 87).

6          During closing argument on the Motion, the Government conceded that it would

7  not use any statements from Sergeant Wilkinson's interview in its case in chief.  (TR 2 at

8  54).

9          Eventually, Officer Cazarez found a duct tape wrapped package that contained

10  $64,881 in United States currency.  (TR 1 at 26).  As Officer Cazarez testified, it was not

11  an easy package to find.  (TR 1 at 26-27).  It was well-hidden close to the transmission in

12  the compartment under the truck cabin.  (TR 1 at 26, *see also* Exhibit 10).  Officer

13  Cazarez testified that it took him four to five hours to discover the package.  (TR 1 at 26).

14  Eventually, the search revealed that the whole floor of the truck's interior cabin contained

15  a hidden compartment with five different entry points.  (TR 1 at 27).

16          It is not clear from the testimony whether Officer Cazarez knew about Defendant's

17  statements to Sergeant Wilkinson before Officer Cazarez discovered the money.  Sergeant

18  Wilkinson said he told Officer Cazarez but Officer Cazarez could not recall if he was told

19  that information.  (TR 1 at 87, 47-48).  Both officers were consistent in testifying that

20  Officer Cazarez was searching Defendant's truck during and after the time Sergeant

21  Wilkinson was interrogating Defendant.  (TR 1 at 88, 33).

22          Because the defense argued officers discovered the money only because of

23  statements Defendant made to them in alleged violation of law, Officer Cazarez was

24  asked whether law enforcement would have inevitably discovered the money at a later

25  date.  Officer Cazarez was asked on direct examination whether law enforcement would

26  have searched the truck again if he had not found the money on that first day.  Officer

27  Cazarez testified that yes, the vehicle would have been searched the following day by a

28                                                  - 9 -

1    different officer and a canine trained to detect the odor of currency.  (TR 1 at 32).  Officer

2    Cazarez also testified law enforcement would have used an x-ray machine on the

3    following day to scan the vehicle.  (TR 1 at 32-33).  If no money had been found, the

4    vehicle would have been transported to a holding facility in Nogales where another team

5    would have searched the vehicle and removed the hidden compartment.  (TR 1 at 33).

6    Officer Cazarez said he is familiar with vehicles being forfeited at the border and based

7    on his knowledge, Defendant's vehicle would have been forfeited.  (TR 1 at 33).

8         On cross-examination, Officer Cazarez admitted that he was not the officer who

9    makes determinations about whether a vehicle will or will not be seized - a watch

10   commander or supervisor makes that decision.  (TR 1 at 48).  Officer Cazarez agreed that

11   before the money was found, he did not know if a decision had been made to seize

12   Defendant's vehicle.  (TR 1 at 48).  Officer Cazarez also agreed that before the money

13   was discovered he did not know whether a canine would search the vehicle the next day,

14   whether an x-ray machine would scan it or whether it would eventually be subject to an

15   inventory search because he did not know whether his superiors would make the decision

16   to seize the vehicle.  (TR 1 at 49).  Although, Officer Cazarez testified that based on his

17   two and half years experience as a Customs Border Protection officer, Defendant's

18   vehicle was one that would have been forfeited.  (TR 1 at 55).

19        After the money was found, the lead case agent, Agent Merchant, arrived at the

20   port of entry.  Agent Merchant began his work by talking with all the officers involved in

21   Defendant's case.  (TR 2 at 6, 16-17).  From his conversations with the officers, Agent

22   Merchant learned that Officer Cazarez had Defendant complete a declaration form and

23   that Defendant made a statement to him about money in the truck; he also learned that

24   Sergeant Wilkinson had a detailed conversation with Defendant during which Defendant

25   admitted to having more than $10,000 in the truck.  (TR 2 at 18-19).  Agent Merchant

26   further discovered that Defendant was never given his *Miranda* rights.  (TR 2 at 18, 20).

27        Agent Merchant then interviewed Defendant.  Sergeant Wilkinson sat in on that

28                                                    - 10 -

interview.  (TR 1 at 64, TR 2 at 4).  At the evidentiary hearing, the defense argued Sergeant Wilkinson's participation in the second interview was part of a deliberate two-step interrogation that intended to render Defendant's *Miranda* rights meaningless.  When asked on cross-examination, Agent Merchant agreed that he did not have to select Sergeant Wilkinson to participate in the interview.  (TR 2 at 23-24).  For their part, both Sergeant Wilkinson and Agent Merchant testified that they did not devise a two-step plan or intend to violate Defendant's *Miranda* rights.  (TR 1 at 66, TR 2 at 34).

For this interview, Defendant was moved from the detention cell to a different area of the office, which had an interview room.  (TR 1 at 67, TR 2 at 7-8).  Agent Merchant began the interview by advising Defendant of his *Miranda* rights.  (TR 1 at 64, TR 2 at 30).  However, neither Agent Merchant nor Sergeant Wilkinson informed Defendant that his prior statements made earlier during the day could not be used against him.  (TR 1 at 91, TR 2 at 26).  Defendant then signed a waiver of rights form.  (TR 1 at 65).

During this second interview, Agent Merchant testified that he did not reference any comments Defendant may have made to other agents or officers.  (TR 2 at 8).  Agent Merchant and Sergeant Wilkinson gave conflicting testimony as to whether Sergeant Wilkinson asked Defendant any questions.  (TR 1 at 92, TR 2 at 27-28).  Regardless of whether Sergeant Wilkinson asked any questions, the evidence shows Agent Merchant controlled the interrogation and Sergeant Wilkinson's role was minimal at most.

Defendant provided a few more details in his second confession.  He told the officers that he had borrowed or been given a truck by Celso Ruiz.  (TR 1 at 67, TR 2 at 8-9).  He said he was given around $2300 to drive the truck and that the truck contained a large quantity of money that he knew was more than $10,000.  (TR 1 at 67).  He stated it was probably from drug proceeds.  (TR 2 at 29).  He also told the officers that he had driven that truck before and been paid $500.  (TR 1 at 67, TR 2 at 9, 29).

Defendant said he felt compelled to talk in the second interview because Sergeant Wilkinson was present.  Defendant said "[b]ecause I already told the local cop that, you

- 11 -

1   know, what I was doing and he was right there present.  I wasn't going to just, you know,

2   lie in front of him.  He probably would have said something."  (TR 2 at 45).  He did not

3   think he had an option to remain silent because as he said "I had already said everything."

4   (TR 2 at 46).

5          At the beginning of the evidentiary hearing, the Government contested

6   Defendant's standing to challenge the search of the truck he was driving.  (TR 1 at 9-10).

7   Defendant testified that he was driving a truck that belonged to a friend of his by the

8   name of Celso Ruiz.  (TR 1 at 11-12).  Defendant has known Mr. Ruiz seven to nine

9   months.  (TR 1 at 12).  Mr. Ruiz let Defendant borrow the truck the night before he got

10  arrested.  (TR 1 at 12).  To pick up the truck from Mr. Ruiz, Defendant went to Mr.

11  Ruiz's house and Mr. Ruiz gave him the keys.  (TR 1 at 12).  Defendant believed the

12  truck belonged to Mr. Ruiz because he "had seen him drive it a couple of times" and had

13  no reason to think the truck did not belong to him.  (TR 1 at 12).  On cross-examination,

14  Defendant testified that he had not had any contact with Mr. Ruiz since the truck was

15  impounded but that Mr. Ruiz found out the truck was impounded through a mutual friend.

16  (TR 1 at 13-14).

17  **II.   STANDING**

18         Defendant must show that he had a reasonable expectation of privacy in the

19  vehicle that was searched.  *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir.2005).

20  Because Defendant did not own the vehicle he can show he has standing to contest the

21  search if he had permission to use the vehicle.  *United States v. Portillo*, 633 F.2d 1313,

22  1317 (9th Cir.1980).  Defendant testified that he borrowed the truck from his friend Celso

23  Ruiz.  He stated he picked the truck up from Mr. Ruiz the night before his arrest and that

24  Mr. Ruiz gave him the keys.  Defendant stated he believed the truck belonged to Mr. Ruiz

25  because he had seen Mr. Ruiz drive the truck a couple of times.  At the evidentiary

26  hearing, the Magistrate Judge found the Defendant met his burden to show he had

27  standing to contest the search.

28

1    **III. DEFENDANT UNDER ARREST**

2           Defendant argues that he was illegally arrested without probable cause when the

3    officers took him into the detention cell and removed his personal belongings.  The

4    parties agree that law enforcement, at a minimum, detained Defendant.  "Detention and

5    questioning during routine searches at the border are considered reasonable within the

6    meaning of the Fourth Amendment."  *United States v. Espericueta-Reyes*, 631 F.2d 616,

7    622 (9th Cir.1980).  The issue in this case becomes whether the detention of Defendant,

8    which did not require probable cause, evolved into an arrest, which must be supported by

9    probable cause.

10          To determine when an arrest occurs at the border, courts must consider "whether a

11   reasonable person would believe that he is being subjected to more than the "temporary

12   detention occasioned by border crossing formalities."  *United States v. Bravo*, 295 F.3d

13   1002, 1009 (9th Cir.2002) *(quoting United States v. Butler,* 249 F.3d 1094, 1100 (9th

14   Cir.2001).  "Thus, whether an individual is in custody depends upon the objective

15   circumstances of the situation, or whether a reasonable innocent person in such

16   circumstances would conclude that after brief questioning he or she would not be free to

17   leave."  *Bravo*, 295 F.3d at 1009 (internal quotation and citations omitted).

18          The Ninth Circuit has analyzed a number of factors determining when a border

19   detention evolves into an arrest.  Handcuffing a person is a substantial factor, but not

20   determinative on its own.  *United States v. Juvenile (RRA-A)*, 229 F.3d 737, 743 (9th

21   Cir.2000), *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir.1981).  In *RRA-A*, the

22   suspect was not under arrest when she was taken to a office and frisked while the vehicle

23   she was riding in underwent a secondary inspection.  229 F.3d at 741.  The detention of

24   the suspect evolved into an arrest, however, when the officers discovered marijuana in the

25   vehicle during the secondary inspection and the suspect was subsequently handcuffed to a

26   bench in a locked security office.  *Id*. at 743.

27          In another case, a suspect was taken to a security office, searched for weapons and

28                                              - 13 -

1   contraband, and seated on a bench to await a search of his vehicle.  *United States v. Doe*,
2   219 F.3d 1009 (9th Cir.2000).  After the officers discovered illegal narcotics in their
3   search of the vehicle, the suspect was moved from a security office to a locked detention
4   cell, at which point the Court found he was under arrest.  *Id*. at 1014.  Likewise, in *Butler*,
5   a suspect was escorted from his vehicle to a security office where officers searched him,
6   confiscated his shoes and belt and placed him in a locked holding cell.  249 F.3d at 1097.
7   The Court found the suspect was in custody when he was placed in a locked cell without
8   his shoes or belt.  *Id*. at 1101.

9        In the case before this Court, Defendant was under arrest when officers took him
10  to a detention cell and removed his personal belongings including his shoes and belt.  As
11  part of their pat-down of Defendant, the officers removed Defendant's shoes, belt, cell
12  phone and wallet.  After they completed their pat-down, they left Defendant in a locked
13  detention cell that contained an aluminum bed, a urinal and a sink.  No one told
14  Defendant that he was not under arrest or that he would be free to leave if nothing was
15  discovered in his vehicle.  A reasonable person would not have felt free to leave after
16  officers took his shoes, belt, wallet and phone and left him in a locked detention cell.
17  Because Defendant was under arrest this Court analyzes whether officers had probable
18  cause to arrest Defendant or whether the arrest was illegal.

19        Probable cause exists "if, under the totality of the circumstances known to the
20  arresting officers, a prudent person would have concluded that there was a fair probability
21  that the individual had committed a crime."  *United States v. Hernandez*, 322 F.3d 592,
22  596 (9th Cir.2003) (internal citation omitted); *see also United States v. Gonzales*, 749
23  F.2d 1329, 1337 (9th Cir.1984).

24        In this case, the officers had probable cause to arrest Defendant.  While attempting
25  to cross the international border into Mexico, Defendant and his passenger raised the
26  suspicions of Officer Cazarez and Sergeant Wilkinson with their answers to the officers'
27  questions.  Defendant told Officer Cazarez that he was carrying just over $2000 in cash

28                                          - 14 -

1   and driving a friend's truck down to Mexico to stay for four days and pick up his young

2   son, who was staying with relatives.  Officer Cazarez searched through the luggage in the

3   vehicle and noticed it contained no female clothing.  He also noticed a new pair of pants

4   in the luggage that was a size 32 or 33.  When Officer Cazarez asked Defendant what size

5   pant he wore, Defendant said size 38.  Officer Cazarez also asked Defendant why his

6   female passenger did not have any clothes in the luggage to which Defendant replied that

7   she had forgotten her luggage.  When Sergeant Wilkinson asked the female passenger

8   why there were no female clothes in the vehicle, she told him that she intended to wear

9   her sister's clothes.  Sergeant Wilkinson thought this was suspicious as people usually do

10  not share undergarments.  Officer Cazarez felt the clothes appeared "staged" as an

11  attempt to mislead law enforcement.  Upon a physical inspection of the vehicle, Officer

12  Cazarez also discovered a hidden compartment in the floor of the truck's cabin that was

13  covered by extremely loose carpet.

14         Defendant argues that the odd luggage for the travel plans of Defendant and his

15  girlfriend along with the hidden compartment are not sufficient facts to show a fair

16  probability that a crime is being committed.  Defendant focuses particularly on the fact

17  that Officer Cazarez found nothing in the hidden compartment in his initial search.

18  Defendant argues that since Officer Cazarez searched the compartment and found

19  nothing, the hidden compartment cannot be a basis for arrest.

20         The Court disagrees.  The hidden compartment was extremely suspicious.  Hidden

21  compartments are widely known as tools for smugglers to conceal contraband while

22  trying to avoid detection.  The suspiciousness of the hidden compartment is not

23  obliterated simply because an initial search into the compartment did not reveal the

24  contraband.  The compartment coupled with the lack of appropriate luggage for the travel

25  plans, and a borrowed vehicle for a multi-day trip to Mexico is a fair probability that

26  Defendant was involved in transporting contraband, likely currency or weapons, across

27  the border into Mexico.  Therefore, Defendant's arrest was not illegal and no statements

28

1   or evidence need be suppressed based on the illegality of the arrest.

2   **IV. *MIRANDA***

3          Defendant also argues that all the statements he made after he was placed in the

4   detention cell without his personal belongings should be suppressed because his *Miranda*

5   rights were violated.  The Fifth Amendment states that "[n]o person . . . shall be

6   compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend.

7   V.  To protect this right, the Supreme Court requires that prior to any custodial

8   interrogation, a person must be informed of his right to remain silent, that his statements

9   may be used against him, and that he has the right to the presence of an attorney.

10  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  These heightened procedural safeguards

11  are meant to balance the "compulsion inherent in custodial surroundings."  *Id.* at 458.

12  Custodial interrogation has two requisite parts: both custody and interrogation.  *Id.* at 444.

13  A person is in custody when his "freedom of action is curtailed to a degree associated

14  with formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal citation

15  omitted).  Interrogation includes express questioning and any words or actions from

16  police "that the police should know are reasonably likely to elicit an incriminating

17  response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

18          Defendant made four separate statements after he was placed in the detention cell

19  and his personal belongings were removed.  The statements included: (1) Defendant's

20  signed declaration that he was carrying less than $10,000; (2) Defendant's question to

21  Officer Cazarez about why he was asked to sign the declaration form when the officers

22  already discovered the money; (3) statements Defendant made to Sergeant Wilkinson

23  when Sergeant Wilkinson questioned him; (4) Defendant's formal statement to Agent

24  Merchant and Sergeant Wilkinson after he was given his *Miranda* warnings.

25          As discussed *supra*, Defendant was in custody from the point when officers placed

26  him in the detention cell and removed his personal belongings.  Therefore, this Court

27  need only consider whether each of the below statements were made in response to an

28                                              - 16 -

1    interrogation from law enforcement to determine whether *Miranda* applies.

2    **1. Defendant's Negative Declaration**

3           After Defendant was escorted to the detention cell and his personal items removed,

4    Officer Cazarez came into the cell to talk to Defendant.  At this point, Officer Cazarez

5    had discovered one door to the hidden compartment and no contraband.  Upon entering

6    the detention cell, Officer Cazarez did not read Defendant his *Miranda* rights.  Instead,

7    Officer Cazarez gave Defendant a declaration form and asked Defendant to declare

8    whether he was transporting more than $10,000 or any weapons.  Without being advised

9    of his rights, Defendant denied that he was carrying more than $10,000 or any weapons.

10   He declared that he had around $2000 and signed the negative declaration.  In essence,

11   Defendant was asked to admit or deny to the crime of failing to declare transportation of

12   more than $10,000, transportation of weapons and whether he was lying to federal

13   officers when he told them earlier that he was carrying less than $10,000.

14          The Court finds Defendant was being interrogated when he signed the form.

15   Officer Cazarez asked Defendant to sign the form and declare the money he had.  Officer

16   Cazarez knew or should have known that asking Defendant to sign this form would elicit

17   an incriminating response.  Officer Cazarez had already discovered the hidden

18   compartment, he knew of Defendant's travel plans and the lack of appropriate clothes for

19   the trip.  By asking Defendant to make his declarations and sign the form, he was asking

20   Defendant to admit that he was either transporting more than $10,000 without declaring it

21   or transporting weapons.  These are both crimes and given the facts Officer Cazarez

22   already had about the hidden compartment, odd travel plans and inappropriate travel

23   luggage, he knew or should have known that asking Defendant to sign this form would

24   elicit an incriminating response.

25          Defendant's declaration on the form was an incriminating statement elicited

26   through custodial interrogation without advisement of his *Miranda* rights.  When

27   custodial interrogation occurs and law enforcement fails to first inform a defendant of his

28                                              - 17 -

1   *Miranda* rights, "no evidence obtained as a result of the interrogation can be used against

2   him." *Miranda*, 384 U.S. at 479.  Defendant's declaration on the form should be

3   suppressed.

4   **2. Defendant's Question to Officer Cazarez**

5        Also at issue in Officer Cazarez's interview with Defendant is the statement

6   Defendant made to Officer Cazarez about the officers finding money in the truck.  There

7   was a factual dispute as to when Defendant made this statement.  The Court found Officer

8   Cazarez's account more credible.  According to him, he was gathering his materials and

9   exiting the cell when Defendant asked him why he had Defendant sign the declaration

10   form if the officers had already found the money.

11        At issue is whether Defendant's statement was in response to interrogation from

12   Officer Cazarez.  Interrogation includes express questioning and the functional

13   equivalent, which "is any statement or conduct which the police should know is

14   'reasonably likely to elicit an [inculpatory or exculpatory] response from the suspect.'"

15   *Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir.1989), *quoting Innis*, 446 U.S. at 301,

16   fn 5 (1980).  In *Shedelbower*, police told a suspect that his accomplice had been arrested

17   and that the victim had identified the suspect, which was not true.  885 F.2d at 572-573.

18   The Ninth Circuit held these statements did not constitute the functional equivalent of

19   interrogation; they were not the type of comments that would encourage a suspect to

20   make some spontaneous incriminating remark.  *Id*. at 573.  Volunteered or spontaneous

21   statements are not interrogation and do not require *Miranda* warnings.  *Miranda*, 384

22   U.S. at 478.

23        Defendant made the statement about the money spontaneously.  As determined by

24   this Court, Defendant completed the negative declaration and then as Officer Cazarez was

25   leaving, Defendant initiated conversation by asking Officer Cazarez why the officer had

26   him fill out the form when the officers had already found the money.  This statement

27   should not be suppressed; it was not the result of interrogation.

28

**3. Defendant's statements during Sergeant Wilkinson's interrogation**

After testimony was taken at the evidentiary hearing, the Government conceded that Sergeant Wilkinson interrogated Defendant and that any statements made during that interview would not be included in the Government's case-in-chief.

All statements Defendant made to Sergeant Wilkinson during this unwarned interrogation should be suppressed.

**4. Defendant's formal statement to Agent Merchant and Sergeant Wilkinson**

Defendant contends the confession that he gave to Agent Merchant and Sergeant Wilkinson after he was advised of his *Miranda* rights should be suppressed because it was obtained pursuant to an unlawful two-step interrogation. The Supreme Court case relied upon by Defendant involved the admissibility of a post-warning confession obtained as part of a two-step interrogation strategy where the officer deliberately withheld *Miranda* warnings until the suspect confessed, then gave *Miranda* warnings and had the suspect repeat the confession already given. *Missouri v. Seibert*, 542 U.S. 600 (2004) (Souter, J., plurality opinion); *Id.* at 618 (Kennedy, J., concurring in the judgment). The justices in the case did not reach a majority opinion, rather a plurality with Justice Kennedy concurring found the two-step interrogation strategy unlawful and voted to suppress the confession.

Because *Seibert* was a plurality decision, the Ninth Circuit has not applied the plurality's test on its own to determine if law enforcement used an unlawful two-step interrogation. Rather, the Ninth Circuit has applied a version of the plurality's test limited by Justice Kennedy's concurrence. *See United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir.2006) ("Ordinarily, '[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (*quoting Marks v. United States,* 430 U.S. 188, 193 (1977)). The Ninth Circuit said:

1
2
3
4
5

> Applying the *Marks* rule to *Seibert,* we hold that a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning-in light of the objective facts and circumstances-did not effectively apprise the suspect of his rights. Although the plurality would consider all two-stage interrogations eligible for a *Seibert* inquiry, Justice Kennedy's opinion narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda's* protections.

6   *Williams*, 435 F.3d at 1157.  Thus, the first inquiry is whether law enforcement employed

7   a *deliberate* two-step interrogation strategy.  Regarding deliberateness, the Ninth Circuit

8   advises courts:

9
10
11
12
13
14

> In determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning.... Once a law enforcement officer has detained a suspect *and subjects him to interrogation* ... there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness.

15   *Thompson v. Runnel*, 621 F.3d 1007, 1016-1017 (9th Cir.2010) (emphasis in original),

16   *quoting Williams*, 435 F.3d at 1158-1159.  Objective evidence includes the timing, setting

17   and completeness of the prewarning interrogation, the continuity of police personnel and

18   the overlapping content of the pre and postwarning statements.  *Williams*, 435 F.3d at

19   1159.

20         If law enforcement is found to have acted deliberately, the Court must then

21   evaluate the effectiveness of the midstream *Miranda* warning to determine whether the

22   postwarning statement is admissible.  *Williams*, 435 F.3d at 1160.  The Court must decide

23   if Defendant had a "genuine choice whether to follow up on [his] earlier admission."

24   *Seibert*, 542 U.S. at 616.  The Court must address "(1) the completeness and detail of the

25   prewarning interrogation, (2) the overlapping content of the two rounds of interrogation,

26   (3) the timing and circumstances of both interrogations, (4) the continuity of police

27   personnel, (5) the extent to which the interrogator's questions treated the second round of

28

interrogation as continuous with the first and (6) whether any curative measures were taken." *Williams*, 435 F.3d at 1160, *quoting Seibert*, 542 U.S. at 615 (Souter, J., plurality opinion).

When a court finds a two-step strategy was not deliberately employed, *Elstad* governs the admissibility of postwarning statements. *Oregon v. Elstad*, 470 U.S. 298 (1985). *Elstad*, a pre-*Seibert* Supreme court case, held an officer's failure to administer *Miranda* warnings did not render a suspect's confession involuntary. In *Elstad*, a burglary suspect made incriminating statements in response to a police officer's statements at his home without first receiving a *Miranda* warning. *Id*. at 301. Officers then took him to the police station where they placed him in an interrogation room, read him his *Miranda* rights, and questioned him at length. *Id*. The suspect provided greater detail in this second statement and made a full confession. *Id*. at 301-302. The Supreme Court upheld the suspect's confession, finding the officers' omission of *Miranda* warnings were "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." *Id*. at 309. In holding the confession should not be suppressed, the Court focused on the voluntariness of the confession. *Id*. at 306-314.

In distinguishing *Elstad* from *Seibert*, the plurality in *Seibert* stated a significant difference was that the unwarned interrogation in *Seibert* was conducted at the police station and was systematic, exhaustive, and managed with psychological skill. *Seibert*, 542 U.S. at 616. It was "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id*. at 615. The Court noted that when police finished the first interview, there was little information left to cover. The *Seibert* plurality then said "[i]n *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a

markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Id*. at 615-616 (Souter, J., plurality opinion).

The prosecution argues the case before this Court is factually similar to *United States v. Narvaez-Gomez*, a case in which the Ninth Circuit found officers did not employ a deliberate two-step interrogation. 489 F.3d 970 (9th Cir.2007). In that case, the suspect was a Mexican native who had been deported numerous times. *Id*. at 972. City police approached him in a park for smoking in violation of a city ordinance. *Id*. Through their conversation, city police became suspicious of the suspect's citizenship and called Border Patrol. A Border Patrol agent came to the park and asked the suspect a number of questions about his citizenship. *Id*. After the officer determined the suspect had no papers to legally be in the United States, she arrested him, handcuffed him and put him in the back of her vehicle. At that point, she asked the defendant if he had ever been arrested by Border Patrol and whether he had ever been deported. *Id*. at 972-973. He confessed to being in the United States illegally and having previously been deported. *Id*. The suspect was taken to the Border Patrol station, *Mirandized* and then interrogated by another agent with the original Border Patrol agent present. *Id*. at 973. The defendant again admitted that he was a citizen of Mexico and that he had previously been deported. *Id*.

Defendant sought to suppress the statements he made after receiving *Miranda* warnings. *Id*. at 973. The District Court denied his motion and found the two-step interrogation was not deliberate. He appealed to the Ninth Circuit, arguing the District Court erred in denying his motion to suppress the post-*Miranda* statements and finding the Border Patrol agent did not engage in a deliberate two-step process. *Id*. The Ninth Circuit denied his appeal. It held the district court did not err in finding no deliberateness

1    because the first confession was in an informal setting and brief in nature, also another

2    agent was present in the second confession and there was a lack of reference to the

3    prewarning statements during the more comprehensive post-warning confession.  *Id*. at

4    974.  The Court also noted a change in setting and a significant time span between the

5    confessions as factors weighing against deliberateness.  *Id*.

6         This Court first analyzes whether Sergeant Wilkinson deliberately withheld the

7    *Miranda* warning prior to interrogating Defendant.  The Court considers the objective

8    evidence including the timing, setting and completeness of the prewarning interrogation

9    as well as the continuity of police personnel and the overlapping content of the pre and

10   post-warning statements.  The objective evidence weighs in favor of finding Sergeant

11   Wilkinson acted deliberately in withholding the *Miranda* warnings.

12        At this point in the investigation, Defendant is suspected of lying to the officers

13   and transporting some type of contraband in the already discovered hidden compartment.

14   Before Sergeant Wilkinson talked with Defendant, Officer Cazarez had already conveyed

15   Defendant's statement that there was money in the truck and the officers had discovered

16   four doors to the hidden compartment but they had failed to find any currency or

17   weapons.  The officers, as the Court found *supra*, had probable cause to arrest Defendant

18   for committing a crime.  Even with all this evidence that Defendant is involved in a

19   crime, Sergeant Wilkinson, an experienced law enforcement officer, did not read

20   Defendant his *Miranda* rights prior to questioning him in the detention cell.

21        Further, Sergeant Wilkinson's interviewed Defendant in the detention cell where

22   Defendant was being held without any of his personal belongings.  The interview covered

23   Defendant's work history and then the crime in detail.  Sergeant Wilkinson asked

24   Defendant a number of questions about his work as a welder.  He then told Defendant that

25   the officers had discovered the multiple entrances to the hidden compartment and that he

26   knew Defendant was lying about the child he was picking up in Jonas, Chihuahua.  He

27   told Defendant there was no reason to lie.  Then, when Defendant began confessing,

28

Sergeant Wilkinson did not advise Defendant of his *Miranda* rights but rather, asked Defendant directly how much money was in the vehicle.  Sergeant Wilkinson obtained a full confession from Defendant in that first interview.  Through his interrogation, Defendant told Sergeant Wilkinson that he was being paid to drive the truck to Jonas, Chihuahua and that there was more than $10,000 in the truck.

Looking at the subjective evidence, Sergeant Wilkinson testified at the evidentiary hearing that he intended to get information from Defendant for a later interview and intended to "prep" Defendant.  Sergeant Wilkinson also testified that he did not engage in a deliberate two-step interrogation of Defendant and purposefully withhold *Miranda* warnings but his responses to other questions suggest this is incorrect.  Sergeant Wilkinson, at the evidentiary hearing, said he wanted to speak with the suspects because he "wanted to prep them for when I questioned them as far as state of mind saying okay, I'm dealing with a state official instead of a federal official."  He also said he wanted to talk to them to "get a reaction" and he agreed with defense counsel that he wanted to get a reaction and get information for a later interview.

There is sufficient evidence that based on the facts and Sergeant Wilkinson's behavior, Sergeant Wilkinson deliberately interrogated Defendant without first reading him his *Miranda* rights.  Because this Court finds Sergeant Wilkinson intended to undermine the *Miranda* warnings by first getting a confession before *Mirandizing* Defendant, the Court must evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible.  The Court will address the five factors outlined by the Ninth Circuit in *Williams*.  435 F.3d at 1160 (internal citation omitted).

First, the prewarning interrogation was a complete confession and included the significant details.  In response to Sergeant Wilkinson's interrogation, Defendant told Sergeant Wilkinson that he was going to deliver the truck to Jonas, Chihuahua and the Sergeant Wilkinson asked Defendant how much money was in the truck and Defendant

1    told him over $10,000.  This conversation was essentially a full confession to the crime of

2    transporting more than $10,000 across the international border without declaring it.

3           Second, in the second interview with both Sergeant Wilkinson and Agent

4    Merchant, Defendant provided a few more details in his confession but much of the

5    content overlapped the first interrogation's content.  Defendant told the officers that he

6    had borrowed the truck from a Celso Ruiz and that he was given $2300 to drive the truck

7    and that the truck contained a large quantity of money, which he knew was more than

8    $10,000.  He also told the officers that the money was probably from drug proceeds and

9    he told them that he had driven that truck before and had been paid $500.  But, in essence,

10   this is the same confession Defendant gave Sergeant Wilkinson.

11          Third, the timing and circumstances of the two interview are different.  While it is

12   unclear from the record how much time passed between the time Defendant gave

13   Sergeant Wilkinson an unwarned statement and the time, at 9:25 p.m., when Agent

14   Merchant *Mirandized* Defendant and he confessed, it is clear that some amount of time

15   passed.  The interviews were not back to back with no break.  In addition to the timing of

16   the interviews being different, the circumstances were somewhat different as well because

17   Defendant was moved from the detention cell to an interview room in a different area of

18   the building.

19          Fourth, there was critical change in the police personnel.  Sergeant Wilkinson

20   conducted the first unwarned interview alone.  Agent Merchant, the lead officer on the

21   case, controlled the second interview.  While Sergeant Wilkinson was present in the

22   second interview and according to him, he did ask some questions, the testimony from

23   him, Agent Merchant and Defendant shows that he did not play a significant role in the

24   second interview.  In fact, Agent Merchant did not remember whether Sergeant

25   Wilkinson asked any questions in the second interview.  Defendant testified as to the

26   presence of Sergeant Wilkinson in the second interview but he did not say that Sergeant

27   Wilkinson asked him any questions.

28
                                            - 25 -

1   Fifth, there is no evidence that Agent Merchant treated the second round of

2   interrogation as continuous with the first.  There was some break in time between when

3   Sergeant Wilkinson interrogated Defendant and when Agent Merchant arrived and then

4   interrogated Defendant.  Also, Agent Merchant took the lead on the second interview and

5   no testimony suggested that Agent Merchant relied on statements Defendant made to

6   Sergeant Wilkinson to get Defendant to again confess to the crime.  There is no evidence

7   that suggests Agent Merchant used any of the information Sergeant Wilkinson gathered in

8   the first unwarned interrogation against Defendant in this second interrogation.

9   Sixth, no curative measures were taken and thus, this factor weighs against the

10  effectiveness of the midstream *Miranda* warning.  Agent Merchant knew that no one had

11  read Defendant his *Miranda* rights at any point during his stay in the detention cell.

12  Agent Merchant knew that Defendant had given first Officer Cazarez and then Sergeant

13  Wilkinson incriminating statements and he knew the content of those statements.  At no

14  point in the second interview did Agent Merchant or Sergeant Wilkinson tell Defendant

15  that his prior statements could not be used against him.  Likewise, he was under arrest the

16  whole time.

17  Considering all six of the factors and the prior Ninth Circuit case law, this Court

18  concludes the *Miranda* warnings given before the interview with Agent Merchant and

19  Sergeant Wilkinson were effective.  Law enforcement did not act without error.  Sergeant

20  Wilkinson appeared intent on getting a confession in the first interview and consciously

21  chose not to give Defendant a *Miranda* warning before pushing for the confession.  Then,

22  Agent Merchant erred in failing to take any curative measures after learning that

23  Defendant had been interrogated twice before his arrival and given statements both times

24  without being *Mirandized*.  Agent Merchant did not inform Defendant that these prior

25  statements could not be used against him and also significant, he elected to include

26  Sergeant Wilkinson in his interview with Defendant.  Sergeant Wilkinson's inclusion in

27  the interview between Defendant and Agent Merchant is unsettling because of the full

28

detail he had gathered in his first unwarned interview with Defendant.  Still, time and a new location distinguished the two interviews.  There was a break between the two interviews, a change in who was in charge of the interview, and a new location for the interview.  Also, Defendant added some significant details to the second interview that he did not offer in the first interview.  When reviewing all six factors, the Court determines the *Miranda* warning was effective.  Defendant's confession to Agent Merchant and Sergeant Wilkinson should not be suppressed.

In coming to this conclusion, the court is mindful of significant distinctions between this case and cases where the two-step process was found to be unlawful.  In those cases, one agency was investigating the matter, whereas in this case three agencies were involved.  Officer Cazarez works for Customs and Border Protection.  Sergeant Wilkinson works for the Douglas Police Department and Special Agent Merchant is assigned to Homeland Security Investigations.  There is no evidence of collusion or joint plan to avoid giving *Miranda* warnings to set up a *Mirandized* statement.  Unfortunately there is no taped recording of the final interrogation, so we do not know the extent to which Defendant was cross-examined based on previous statements to Sergeant Wilkinson.  However, it appears that was likely unnecessary in this case because there is no evidence that Defendant was reluctant to talk or gave material false information after he was in custody.  Sergeant Wilkinson and Agent Merchant had different motivation.  Sergeant Wilkinson wanted to find contraband and seize the vehicle for Cochise County.  Agent Merchant wanted to investigate a federal felony offense.  In that role, Agent Merchant advised Defendant of his *Miranda* rights at the beginning of their interview.

Secondly, Defendant made an incriminating statement that was not unlawfully obtained - Defendant's statement to Sergeant Wilkinson about the officers finding money in the truck.  It would be impossible to parse out whether Defendant felt compelled to confess based on the lawfully obtained initial statement or the more detailed statement to Sergeant Wilkinson.  These distinctions support the Court's conclusion that the post-

1   *Miranda* statement should not be suppressed.

2   **V.  DISCOVERY OF THE CURRENCY**

3   Defendant argues the $64,881 in United States currency discovered in the hidden

4   compartment of Defendant's truck should be suppressed as fruits of an illegal arrest

5   pursuant to *Wong Sun v. United States*.  371 U.S. 471, 485 (1963).  As previously

6   discussed by this Court, the arrest of Defendant was not illegal because the officers had

7   probable cause to believe Defendant was illegally transporting weapons or currency

8   across the international border.

9   Defendant also argues law enforcement only discovered the money because of

10  incriminating statements Defendant without being read his *Miranda* rights while he was

11  in custody and being interrogated.  It is true that Officer Cazarez's initial search of

12  Defendant's truck revealed only one door to the hidden compartment and no contraband.

13  It is also true that Defendant was in custody when Officer Cazarez asked him to complete

14  the declaration form.  However, Defendant's statement to Officer Cazarez asking why he

15  was asked to sign the form when the officers had already discovered the money, was a

16  spontaneous statement that was not the result of interrogation.  Such spontaneous

17  statements are not subject to *Miranda* warnings as the suspect is not being questioned

18  when the statement is offered.  Once Defendant made this statement to Officer Cazarez,

19  the evidence is clear that Officer Cazarez intended to search Defendant's truck until he

20  found the money or determined that the entire compartment was empty.

21  Furthermore, officers would have eventually discovered the currency after

22  Defendant spontaneously asked Officer Cazarez why he had to sign a negative declaration

23  form when the officers had already found the money.  *See Nix v. Williams*, 467 U.S. 431,

24  446-447 (1984).  While it is true that Officer Cazarez was not in charge of the case and

25  therefore not the officer who decided whether to seize the vehicle, after Defendant made

26  the statement about money in the truck, Officer Cazarez testified that in his experience

27  the truck would have been seized and subjected to further, more detailed searching.  The

28  - 28 -

1   Government only needs to prove by a preponderance of the evidence that the money

2   would have been inevitably discovered.  *Id*. at 444.  The Government satisfies that

3   burden.

4   **VI.    RECOMMENDATION**

5        For the reasons outlined above, the Magistrate Judge recommends that the District

6   Judge after his independent review, GRANT in part and DENY in part the Motion to

7   Suppress.  (Doc. 20).  The Magistrate Judge recommends that the District Judge, GRANT

8   Defendant's Motion as to the signed negative declaration form and any statements made

9   during an interrogation with Sergeant Wilkinson and DENY Defendant's Motion in all other

10  requests for suppression.

11       Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file

12  written objections within fourteen days of being served with a copy of the Report and

13  Recommendation.  If objections are not timely filed, they may be deemed waived.  The

14  parties are advised that any objections filed are to be identified with the following case

15  number: **cr-09-2795-JMR**.

16       DATED this 21st day of December, 2010.

17

18   _____

19   **CHARLES R. PYLE**

20   **UNITED STATES MAGISTRATE JUDGE**

21

22

23

24

25

26

27

28
                                - 29 -