1
2
3
4
5
6                     IN THE UNITED STATES DISTRICT COURT
7                        FOR THE DISTRICT OF ARIZONA
8
9   UNITED STATES OF AMERICA,        )    CR-09-02795-TUC-CKJ (CRP)
                                      )
10              Plaintiff,            )
                                      )    **ORDER**
11  vs.                               )
                                      )
12  ERNESTO                           )
    HERNANDEZ-BARRAGAN,               )
13                                    )
                Defendant.            )
14  _____ )

15          On December 21, 2010, Magistrate Charles R. Pyle issued a Report and

16  Recommendation on Defendant's Motion to Suppress [Doc. 20] based on an alleged unlawful

17  arrest or in the alternative, a violation of *Miranda*.[1] Magistrate Judge Pyle recommended that

18  Defendant's Motion to Suppress [Doc. 20] be granted in part and denied in part. On January

19  3, 2011, Defendant filed his Objection to Report and Recommendations [Doc. 48].  On

20  January 26, 2011, the Government filed its Response to Defendant's Objection to

21  Magistrate's Report and Recommendations ("R & R") [Doc. 19]. Upon independent review

22  and for the reasons delineated herein, the Report and Recommendation is adopted.

23  . . .

24  . . .

25  . . .

26  . . .

27  _____

28          [1]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I. STANDARD OF REVIEW

The Court reviews de novo the objected-to portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The Court reviews for clear error the unobjected-to portions of the Report and Recommendation. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *See also, Conley v. Crabtree*, 14 F.Supp.2d 1203, 1204 (D. Or. 1998).

## II. FACTUAL BACKGROUND

The factual background contained in Magistrate Judge Pyle's R & R is uncontested.[2] As such, it is adopted by reference herein.

## III. ANALYSIS

Defendant objects to the Magistrate Judge's R & R on several grounds.  First, he asserts that the Magistrate Judge "reversed the burden of proof, failed to consider the presumption of exclusion, and overlooked key testimony and precedent in applying the factors in *U.S. v. Williams*, 435, F.3d 1148 (9th Cir. 2006)."  Def.'s Obj. to Magistrate's R & R [Doc. 48] at 1.  Second, Defendant asserts that the Magistrate Judge "erred in ruling that Defendant's question to Agent Cazarez was spontaneously volunteered, rather than the result of official interrogation."  *Id.* at 2.  Third, Defendant urges that the Magistrate Judge erred in ruling that the agents had probable cause to arrest, and that the Government had met its burden of proof regarding inevitable discovery.  *Id.*  Finally, Defendant avers that the Magistrate Judge erred by not addressing the validity of the *Miranda* waiver, the voluntariness of the pre- and post-warning statements and the unreasonableness of the border search based upon the "offensive manner" in which it was conducted.  *Id.*

---

[2]Defendant contests a credibility determination made by Magistrate Judge Pyle, as well as his conclusion regarding inevitable discovery of the contraband.  The Court will review these findings below; however, they do not change the factual background as described by the Magistrate Judge.

*A.   Defendant's Formal Statement to Agent Merchant and Sergeant Wilkinson*

1.  Burden of Proof

Defendant asserts that the delayed *Miranda* warnings given by Agent Merchant were not effective to dissipate the impact of the prior unwarned confession.  Defendant argues that the Magistrate Judge reversed the burden of proof in establishing that the deliberate use of a two-step interrogation did not occur.  The Ninth Circuit has recognized that where a "district court made the finding by applying a preponderance of evidence standard and did not rely on an absence of evidence from a party bearing the burden of proof, [it] need not decide what party bears the burden of proof."  *United States v. Phipps*, 290 Fed. Appx. 38, 39 (9th Cir. 2008) (unpublished decision) (citing *United States v. Ollie,* 442 F.3d 1135, 1142-43 (8th Cir. 2006)).  "When an interrogator has deliberately employed the two-step strategy, *Seibert* requires the court then to evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible."  *United States v. Williams*, 435 F.3d 1148, 1160 (9th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600, 615, 124 S. Ct. 2601, 159 L. Ed.2d 643 (2004) (Souter, J., plurality opinion); *id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in judgment)).  The *Williams* court went on to state that:

> [T]he court must address (1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first and (6) whether any curative measures were taken.

*Williams*, 435 F.3d at 1160  (citing *Seibert*, 542 U.S. at 615, 124 S. Ct. 2601 (Souter, J., plurality opinion); *id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in judgment)).  Magistrate Judge Pyle considered each of the *Williams* factors in concert with the facts of this case and made his finding based upon a preponderance of the evidence.  As such, he did not apply the incorrect burden of proof.

2.  Effectiveness of Midstream *Miranda* Warning

Magistrate Judge Pyle extensively reviewed the relevant United States Supreme Court and Ninth Circuit Court of Appeals authority regarding two-step interrogations and

midstream *Miranda* warnings.  *See* R & R [Doc. 47].  As an initial matter, Magistrate Judge Pyle analyzed "whether Sergeant Wilkinson deliberately withheld the *Miranda* warning prior to interrogating Defendant."  *Id.* at 23.  Based upon a thorough review of the testimony and other evidence received, Magistrate Judge Pyle determined that "Sergeant Wilkinson deliberately interrogated Defendant without first reading him his *Miranda* rights."  *Id.* at 24.  This finding is uncontested by the parties.

Regarding the first *Williams* factor, Magistrate Judge Pyle found that "the prewarning interrogation was a complete confession and included [] significant details." R & R [Doc.47] at 24.  Sergeant Wilkinson  testified that he told Defendant that "[they] had already found compartments in his truck and there was, you know, no reason to lie."  Hr'g. Tr. 10/13/2010 [Doc. 33] at 63:25-64:8.  Sergeant Wilkinson further testified that "[a]t that point [Defendant] stated well, you already found the money.  And I said, well how much money are we talking about?  And he said, I don't know, it was more than $10,000."  *Id.*  Defendant testified that:

> [After Sergeant Wilkinson talked to Defendant about his job as a welder, Sergeant Wilkinson] just started talking about the hidden compartments in the truck, he was asking me if I had done the handling, that work on the truck myself.  And, you know, I told him I hadn't done that and then, you know, he – he told me – then he started asking me why was I lying, you know, what – what was the reason for me to be lying.  I told him that, you know, that's when I actually told him that I was taking the truck down to Janos and was going to pay – was going to get paid to actually take it down there.

Hr'g Tr. 11/4/2010 [Doc. 39] at 42:10-43:5.  As Magistrate Judge Pyle determined, Defendant's prewarning confession was complete and essentially a full confession.  R & R [Doc. 47] at 25.  Neither party disputes this finding.

Second, Magistrate Judge Pyle found that "in essence, [the confession to Agent Merchant and Sergeant Wilkinson together was] the same confession Defendant gave Sergeant Wilkinson.  R & R [Doc. 47] at 25.  Defendant told Agent Merchant and Sergeant Wilkinson that he had borrowed the truck from Celso Ruiz, who had given him approximately $2,300.00 in cash with instructions to drive the truck to Jonas, Chihuahua, Mexico.  Def.'s Ex. 102 at 15.  Defendant was to be paid $500.00 plus expenses for the trip,

1   and knew that the truck contained more than $10,000. Def.'s Ex. 103 at 3. Defendant stated

2   that he believed the money was proceeds from drugs. *Id.*; Def.'s Ex. 102 at 15.

3          Relying on *Seibert*, Defendant asserts that the substantially overlapping content of the

4   confessions favors suppression.  Although the *Seibert* plurality acknowledges that "a series

5   of relevant facts [] bear on whether *Miranda* warnings delivered midstream could be

6   effective enough to accomplish their object . . . [including] the overlapping content of the two

7   statements[,]" the Court did not hold that overlapping content necessarily favors suppression.

8   *Seibert*, 542 U.S. at 615, 124 S. Ct. at 2612.   In *Seibert*, one of the reasons that the

9   confessions overlapped was that the interrogating officers corrected Defendant's statements

10  during the second interview based on information received during the first. *Id.* at 605-6, 124

11  S. Ct. at 2606.   Moreover, the officers in *Seibert*, set the stage for the post-warning

12  confession merely as a continuation of the pre-warning discussion. *Id.* at 616, 124 S. Ct. at

13  2613.  The evidence before this Court does not support that Sergeant Wilkinson directed or

14  corrected Defendant's statements during the second interview based upon information he had

15  previously received.

16         Third, Magistrate Judge Pyle found a difference in the timing and circumstances of

17  the two interviews. R & R [Doc. 47] at 25.  Defendant asserts that the Magistrate overlooked

18  Defendant's testimony that the break between the two sessions was an hour or more. Def.'s

19  Obj. [Doc. 48] at 4.  Defendant relies on the United States Supreme Court decision in

20  *Maryland v. Shatzer*, – U.S. –, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), for the proposition

21  that an hour is insufficient "to dissipate the taint of the prior unwarned confession." Def.'s

22  Obj. [Doc. 48] at 4.  The Court in *Shatzer* considered "whether a break in custody ends the

23  presumption of involuntariness established in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct.

24  1880, 68 L.Ed.2d 378 (1981)."  *Shatzer*, 130 S.Ct. at 1217.  The *Edwards* rule contemplates

25  a defendant's request for counsel, not his right from self-incrimination. *Edwards*, 451 U.S.at

26  484-85, 101 S.Ct. at 1885 (holding that "an accused . . . having expressed his desire to deal

27  with the police only through counsel, is not subject to further interrogation by the authorities

28  until counsel has been made available to him, unless the accused himself initiates further

communication, exchanges, or conversations with the police."). The Ninth Circuit Court of Appeals has specifically held that "approximately four hours between statements also indicate[s] a lack of deliberateness" upholding the district court's determination that the agents "did not deliberately employ a two-step interrogation." *United States v. Narvaez-Gomez*, 489 F.3d 970, 974-75 (9th Cir. 2007). The court of appeals further cited with approval a Tenth Circuit Court of Appeals case which held that "moving defendant to different vehicle and waiting for other agents to arrive provided sufficient time delay and change in setting." *Id.* at 974-5 (citing *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1152 (10th Cir. 2006). Defendant was initially stopped at the outbound United States Port of Entry in Douglas Arizona at between approximately 4 and 4:30 in the afternoon. Hr'g Tr. 10/13/2010 [Doc. 33] at 35:10-12; Def.'s Ex. 102 at 13. Defendant testified that he was taken inside and placed in a detention cell where he waited for approximately 25 minutes before Officer Cazarez came in. Hr'g Tr. 11/14/2010 [Doc. 39] at 40:3-6. Defendant further testified that it was approximately two hours after Officer Cazarez left him, before Defendant's first encounter with Sergeant Wilkinson. *Id.* at 41:16-18. Defendant then testified that the time between his first encounter with Sergeant Wilkinson and the transfer to the interview room "seemed like a while. I would say maybe a – an hour or more than an hour." *Id.* at 43:14-17. At 9:25 p.m., Defendant was given his *Miranda* rights and signed the waiver of rights form. Def.'s Ex. 105. Based on the record before this Court, the time between the two interviews could be anywhere from an hour to upwards of two and a half hours. Indeed, Defendant's own testimony is ambiguous as to this point. As Magistrate Judge Pyle correctly stated "it is clear that some amount of time passed, [and] [t]he interviews were not back to back with no break." R & R [Doc. 47] at 25.

Magistrate Judge Pyle also noted that the circumstances of the interviews "were somewhat different as well because Defendant was moved from the detention cell to an interview room in a different area of the building." R & R [Doc. 47] at 25. Relying on *Thompson v. Runnel*, 621 F.3d 1007 (9th Cir. 2010), Defendant asserts that "a short break in time and minor change in the location of custody, where the atmosphere remained 'police-

1    dominated' and police continued to control the suspect's fate, does not provide the necessary

2    'opportunity for further deliberation in familiar surroundings.'" Def.'s Obj. [Doc. 48] at 4

3    (quoting *Thompson*, 621 F.3d at 1020).

4         In *Thompson*, the Ninth Circuit Court of Appeals considered the effectiveness of mid-

5    stream *Miranda* warnings in light of a deliberate two-step interrogation. *Thompson*, 621 F.3d

6    at 1018. There, defendant Thompson's sometime girlfriend was murdered in the afternoon

7    of June 22, 1998. *Id.* at 1010. Early in the afternoon, Thompson's father witnessed the two

8    speaking outside of his home. *Id.* Later he took Thompson over to the girlfriend's house

9    where Thompson found the body. *Id.* When the police arrived Thompson did not feel well

10   and laid down in the air-conditioned police cruiser. *Id.* Later, officers woke Thompson up

11   and asked him to come down to the police station to talk about finding the body. *Thompson*,

12   621 F.3d at 1010. Thompson was placed in a break room at the station, where he waited for

13   approximately six (6) hours. *Id.* Around 11:00 p.m. that evening, officers moved Thompson

14   into an interview room and began a two-hour interview. *Id.* During this initial interview, no

15   *Miranda* rights were given and the officers employed several techniques to induce Thompson

16   to incriminate himself. *Id.* at 1010-11. Thompson ultimately confessed to the murder. *Id.*

17   at 1011. At that point, the officers read Thompson his *Miranda* rights. *Thompson*, 621 F.3d

18   at 1011. Despite Thompson's request to end the interview, at approximately 2:00 a.m.

19   officers took Thompson out "to look for the murder weapon and clothing that he had

20   burned." *Id.* at 1012. Thompson spent the night in jail, was re-advised of his *Miranda* rights

21   the following morning, and later in the afternoon participated in a videotaped reenactment

22   of the crime at the victim's home. *Id.* Considering the totality of the circumstances the

23   *Thompson* court held that both sets of mid-stream *Miranda* warnings were ineffective. *Id.*

24   at 1021. In the instant case, the proposition that Defendant relies upon comes on the heels

25   of the following discussion by the *Thompson* court:

26        The timing and circumstances of the second set of warnings, particularly the
          break in time and change in location, were somewhat more conducive to a
27        knowing and intelligent waiver than in the case of the first warnings. But on
          balance, this factor does not support the conclusion that the warnings were
28        effective either. At the conclusion of the previous night's interrogation at

1   around 2:00 a.m., Thompson accompanied the police to search for the murder
2   weapon and his bloodied clothing. Afterwards, still distraught and suicidal, he
    spent the rest of the night shackled to the floor of a suicide-watch room at the
3   main detention facility in Martinez. Stripped to his underwear and deprived
    of blankets or a bed, Thompson was too cold to sleep.

4   *Thompson*, 621 F.3d at 1020. It was under *these* circumstances that the *Thompson* court

5   found the "short break in time and minor change in location" insufficient to find the mid-

6   stream *Miranda* warnings effective.

7       In the instant case, there was a break in time and location within the building between

8   interviews. There is no evidence that Defendant was sleep deprived, emotionally distraught

9   or otherwise unable to reflect upon his circumstance.

10      Fourth, Magistrate Judge Pyle found that there was a "critical change in the police

11  personnel." R & R [Doc. 47] at 25. Defendant asserts that the objective evidence weighs

12  against such a finding. This Court agrees with the Magistrate Judge's findings. The record

13  demonstrates that Agent Merchant controlled the second interview. *See id.* "While Sergeant

14  Wilkinson was present in the second interview and according to him, he did ask some

15  questions, the testimony from him, Agent Merchant and Defendant shows that he did not

16  play a significant role in the second interview." *Id.* Moreover, Agent Merchant's statement,

17  "you already know Sergeant Wilkinson" is in lieu of a second introduction. It contrasts with

18  Officer Hanrahan's statement in *Seibert*, "we've been talking for a little while about what

19  happened on Wednesday the twelfth, haven't we?" *Seibert*, 542 U.S. at 616, 124 S.Ct. at

20  2613. Nothing in the record before this Court suggests that Agent Merchant's statements to

21  Defendant gave "[t]he impression that the further questioning was a mere continuation of the

22  earlier questions and responses [were] fostered by references back to the confession already

23  given." *Id.* Furthermore, Sergeant Wilkinson's statement during his initial encounter with

24  Defendant that "there was a possibility that this might go state" reinforces that he does not

25  have any power regarding the federal charges, and represents an entity separate from Agent

26  Merchant. Finally, when asked how Sergeant Wilkinson was aggressive during the first

27  interview, Defendant said that "he was being kind of loud and like – like I – I guess he was

28  – he sounded pissed because he had found out that we were lying to it, seemed a little anger

1    – angry." Hr'g Tr. 11/4/2010 [Doc. 39] 43: 6-13.  This encounter was brief and unlike in
2    *Seibert* or *Thompson*, the questioning was not "systemic, exhaustive, and managed with
3    psychological skill" nor sophisticated.   *Seibert*, 542 U.S. at 616, 124 S.Ct. at 2612;
4    *Thompson*, 621 F.3d at 1017.

5          Fifth, the evidence does not support that Agent Merchant relied on Defendant's prior
6    statements in his questioning.  Contrary to Defendant's assertion, an acknowledgment of a
7    prior meeting in lieu of reintroduction does not "alone incorporate[] the Defendant's prior
8    statements into the second session."  Def.'s Obj. [Doc. 48] at 6.  Defendant argues that a
9    negative inference against the Government is appropriate here; however, this Court is not
10   under an obligation to disbelieve Agent Merchant's testimony.

11         Sixth, Magistrate Judge Pyle found that no curative measures were taken by Agent
12   Merchant during the second interview.  R & R [Doc. 47] at 26.  Considering the totality of
13   the circumstances in this case, the Court agrees with Magistrate Judge Pyle's finding "the
14   *Miranda* warning was effective [and] Defendant's confession to Agent Merchant and
15   Sergeant Wilkinson should not be suppressed."  *Id.* at 27.

16

17         **B.      *Defendant's Question to Officer Cazarez***

18         Defendant argues that Magistrate Judge Pyle erred in analyzing Defendant's signing
19   of the declaration form and his verbal question to Officer Cazarez, "Since you already found
20   the money, why did you have me sign the form?" separately.  Def.'s Obj. [Doc. 48] at 9.
21   Defendant further objects to the Magistrate Judge's finding that Officer Cazarez's account
22   was more credible.  R & R [Doc. 47] at 18.  Officer Cazarez testified that "[a]fter he signed
23   the form, I took the form from him, I took my pen back, and when I was about to exit the
24   detention cell [Defendant] stated officer, I have a quick question.  I replied okay, what is it?
25   Since you already found the money, why did you have me sign the form?  And that's – I did
26   not reply.  I just withdrew."  Hr'g Tr. 10/13/2010 [Doc. 33] at 25:22-26:3.  Officer Cazarez
27   was walking out the door when Defendant questioned him.  *Id.* at 26:4-8.

28

1    The Court agrees with Magistrate Judge Pyle's analysis.  Magistrate Judge Pyle had

2    the opportunity to hear the testimony and observe both witnesses' demeanor.  *See Palmer*

3    *Coking Coal Co. v. Director, Office of Workers' Comp. Programs of U.S. Dept. of Labor*,

4    720 F.3d 1054 (9th Cir. 1983).Defendant contends that Officer Cazarez was impeached by

5    Agent Merchant's testimony; however, Agent Merchant testified that his "understanding

6    from the begi – from the beginning of the search, the continuance of the search, Mr.

7    Hernandez made the statements and the search did continue.  But from my understanding

8    there wasn't a start and a stop and a start."  Hr'g Tr. 11/4/2010 [Doc. 39] at 18:11-18.

9    Officer Cazarez testified that he was not finished with his inspection of the truck when

10   Defendant asked him about finding the money.  Hr'g Tr. 10/3/2010 [Doc. 33] at 45:17-19.

11   This Court finds that the evidence in the record supports Magistrate Judge Pyle's conclusion.

12   Defendant's statement about the money was spontaneously made, and the conversation was

13   initiated by him.  As such, this statement was not the result of interrogation, and should not

14   be suppressed.  *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630.

15

16   **C.    *Probable Cause to Arrest***

17   Defendant asserts that there was no probable cause to arrest.  Def.'s Obj. [Doc. 48]

18   at 9.  Defendant argues that because the lawful non-factory compartment was searched and

19   found to be empty, there was no dog alert to the presence of contraband, nor an admission

20   by either occupant to the commission of a crime, probable cause did not exist.  *Id.* at 9-10.

21   "Probable cause exists if, under the totality of the circumstances known to the

22   arresting officers, a prudent person would have concluded that there was a fair probability

23   that the individual had committed a crime."  *United States v. Hernandez*, 322 F.3d 592, 596

24   (9th Cir. 2003) (citations omitted); *see also United States v. Ocampo*, 937 F.2d 485, 490 (9th

25   Cir. 1991) (reiterating the rule that a probable cause determination requires a totality of the

26   circumstances approach).  Defendant told Officer Cazarez that he and his passenger were en

27   route to Janos, Chihuahua, Mexico for a few days, the truck belonged to a friend, and that

28   he was carrying just over $2,000.  Hr'g Tr. [Doc. 33] at 18:24-19:24.  The vehicle did not

1   have a license plate on it. *Id.* at 19:11-19.  Officer Cazarez searched the luggage and found

2   that there was no female clothing, and at least one pair of pants were a much smaller size

3   than those worn by Defendant. *Id.* at 21:2-22:4.  Officer Cazarez suspected that the vehicle

4   was staged, meaning that it was set up to appear normal in an effort to conceal smuggling

5   activity. *Id*. at 22:7-15.  Officer Cazarez did a physical examination of the truck and found

6   loose carpeting on the driver side floor concealing a hidden compartment.  Hr'g Tr. [Doc. 33]

7   at 22:16-24.

8           As Magistrate Judge Pyle stated:

9           The hidden compartment was extremely suspicious.  Hidden compartments are
            widely known as tools for smugglers to conceal contraband while trying to
10          avoid detection.   The suspiciousness of the hidden compartment is not
            obliterated simply because an initial search into the compartment did not
11          reveal the contraband.

12   R & R [Doc. 47] at 15.  The totality of the circumstances, including the hidden compartment,

13   the lack of appropriate luggage for a multi-day trip, the apparent lack of a license plate, and

14   the large amount of cash Defendant declared on his person all suggest that there was a fair

15   probability that Defendant was involved in transporting contraband across the border into

16   Mexico.  The Court finds that the officers had probable cause to arrest Defendant, and that

17   suppression based upon an illegal arrest is unwarranted.

18

19          *D.      Inevitable Discovery*

20          Defendant objects to Magistrate Judge Pyle's factual finding that "law enforcement

21   intended to continue searching Defendant's vehicle until contraband was found or the entire

22   compartment was determined to be empty."  R & R [Doc. 47] at 7.  Officer Cazarez's initial

23   physical inspection of the truck found loose carpeting on the driver side floor concealing a

24   hidden compartment.  Hr'g Tr. [Doc. 33] at 22:16-24.  Defendant spontaneously questioned

25   Officer Cazarez regarding the money hidden in the vehicle, while the physical examination

26   of the vehicle was ongoing.  Hr'g Tr. 10/3/2010 [Doc. 33] at 45:17-19.  Officer Cazarez

27   testified that it was "standard operating procedures[,] . . . Once we determine that a vehicle

28   is already going to be seized, we have to go back and determine there's nothing still there."

1   Hr'g Tr. 10/13/2010 [Doc. 33] at 27:20-24.  Although Officer Cazarez did not have the

2   authority to determine whether or not a vehicle would be seized, he had been instructed by

3   his supervisor to keep going with the truck.  *Id.* at 47:25-48:12.

4          The law requires that persons transporting more than $10,000 from a place within the

5   United States to a place outside of the United States must declare the money.  31 U.S.C. §

6   5316.  "For purposes of ensuring compliance with the requirements of section 5316, a

7   customs officer may stop and search, at the border and without a search warrant, any vehicle,

8   vessel, aircraft, or other conveyance, any envelope or other container, and any person

9   entering or departing from the United States."  31 U.S.C. § 5317.  Officer Cazarez testified

10   that even if the money had not been found on the day of the stop, the vehicle would have

11   been searched the following day either by a canine trained to detect currency or an x-ray

12   machine.  Hr'g Tr. 10/13/2010 [Doc. 33] at 32:7-33:8.  Officer Cazarez further testified that

13   if no money were found at all, the truck would have been transported to Nogales and another

14   team would inspect the vehicle and remove the false floor.  *Id.* at 33:2-8; *See United States*

15   *v. Cotterman*, – F.3d –, 2011 WL 1137302 (9th Cir. (Ariz.)) (holding transport of laptop

16   computer away from border to laboratory in Tucson for forensic analysis a permissible

17   extension of a border search).   The protocol followed by Border Patrol in this case

18   underscores the Court's finding that the discovery of the currency was inevitable.

19

20         E.    *Additional Defense Claims*

21              1.  Reasonableness of Border Search.

22          Defendant asserts that the border search was not "reasonable."  Defendant urges that

23   the Constitutional violations coupled with the offensive manner in which the border search

24   was carried out makes the search unreasonable.   Considering the totality of the

25   circumstances, the officers had probable cause to arrest Defendant.  Further, the border

26   search was not unnecessarily lengthy.  Defendant spontaneously questioned Officer Cazarez

27   regarding the money.  The Court finds that the circumstances surrounding this border search

28   were not offensive or unreasonable.

2.  Involuntariness and *Miranda* Waiver

The Defendant's "waiver of Miranda rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (internal citations and quotations omitted).  "The prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his *Miranda* rights." *Id.* (internal citations omitted).  Similarly, the Government "must prove that a confession is voluntary by a preponderance of the evidence." *U.S. v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).

Defendant relies on his testimony that he did not feel like he had the option to remain silent as evidence of the involuntariness of his post-warning confession.  Def.'s Obj. [Doc. 48] at 10.  As Justice Breyer noted in *Seibert*, however, "[t]he truly 'effective' *Miranda* warnings on which the plurality insists . . . will occur only when certain circumstances – a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning-intervene between the unwarned questioning and any postwarning statement." *Seibert*, 542 U.S. at 618, 124 S.Ct. at 2614 (Breyer, J., concurring).  Agent Merchant gave Defendant a *Miranda* rights form in English.  Hr'g Tr. 11/14/2010 at 6:11-18.  Defendant read the form and Agent Merchant asked if he had any questions.  *Id.*  Defendant responded no, and indicated his willingness to speak with Agent Merchant.  *Id.*  Agent Merchant further testified that he makes a point "to go down with all the people that [he] mirandize[s] and explain to them that they can stop questioning at any time.  They can – once the process starts, they can stop." *Id.* at 6:24-7:4.  Defendant testified that he was not going to lie in front of the local cop because "[h]e probably would have said something." *Id.* at 45:18-25.  The constitutional validity of Defendant's waiver, however, is questionable where police conduct "deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986).  "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to

- 13 -

secure a conviction, the analysis is complete and the waiver is valid as a matter of law. *Id.* at 422-23, 106 S.Ct. 1141. The record before this Court, based upon the totality of the circumstances indicate that Defendant's decision to speak was "a free and deliberate choice rather than [based upon] intimidation, coercion, or deception." *Id.* at 421, 106 S.Ct. at 1141. Moreover, Defendant was fully aware that he could stop Agent Merchant's questioning at any time, but chose not too. As such, Defendant's statements were voluntary and his waiver valid.

Accordingly, after an independent review of the pleadings, exhibits and transcript, IT IS HEREBY ORDERED that:

1.    The Report and Recommendation [Doc. 47] is ADOPTED;

2.    Defendant Hernandez-Barragan's Motion to Suppress [Doc. 20] is GRANTED IN PART and DENIED IN PART; and

3.    The Clerk of the Court is directed to return all exhibits to counsel.

DATED this 1st day of June, 2011.

_____
Cindy K. Jorgenson
United States District Judge